# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| DENTSPLY International Inc. and DENTSPLY IH Inc., | Civil No. 13-394 (DWF/JJG) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Shari Rene, | |
| Defendant. | |

___

Joseph G. Schmitt, Esq., and Katie M. Connolly, Esq., Nilan Johnson Lewis PA, counsel for Plaintiffs.

Brian M. Childs, Esq., and V. John Ella, Esq., Jackson Lewis LLP, counsel for Defendant.

___

# INTRODUCTION

This matter is before the Court on a Motion for a Temporary Restraining Order brought by Plaintiffs DENTSPLY International Inc. ("DENTSPLY") and DENTSPLY IH Inc. ("DENTSPLY IH") (together, "Plaintiffs"). (Doc. No. 6.) For the reasons set forth below, the Court denies the motion.

# BACKGROUND

DENTSPLY develops, manufactures, and sells professional dental products. (Doc. No. 8, Baldwin Aff. ¶ 2.) In late 2011, DENTSPLY began the process of integrating the dental implants business of its wholly-owned subsidiary, Tulsa Dental

Products LLC ("Tulsa"), into its wholly-owned subsidiary, DENTSPLY IH, for the purpose of creating a central dental implants business. (*Id*. ¶ 3.) DENTSPLY IH does business as DENTSPLY Implants (also referred to as "DENTSPLY") in developing, manufacturing, and selling dental implants and abutments, as well as instruments used in placing the implants, and related computer software. (*Id*. ¶¶ 3, 5.) DENTSPLY manufactures and distributes regenerative materials, which are, in general, bone and tissue products. (*Id*. ¶ 5.) DENTSPLY employs sales representatives to market its products within specified sales territories. (*Id*. ¶ 6.) As part of the integration of Tulsa's dental implants business into DENTSPLY, many of Tulsa's sales representatives became sales representatives of DENTSPLY. (*Id*. ¶ 4.)

In April 2012, Defendant Shari Rene ("Rene") became an employee of DENTSPLY as part of the sales force integration. (*Id*. ¶ 21.) Before that, and since July 2006, Rene was employed by Tulsa. (*Id*.) Rene resigned her employment with DENTSPLY on June 29, 2012. (*Id*.) At the time, she was a District Manager. (*Id*.) While working for Tulsa and DENTSPLY, Rene was responsible for marketing dental implant products to dentists, oral surgeons, periodontists, and laboratories within her geographic territory. (*Id*. ¶ 22.) Prior to integration, Rene's territory included Minnesota, North Dakota and parts of Wisconsin and Nebraska. (*Id*.) After Rene became an employee of DENTSPLY, her territory changed and Renee was assigned to Minneapolis Southeast/Rochester territory, which includes parts of Minneapolis and St. Paul, Minnesota, and Eau Claire, Wisconsin. (*Id*. ¶ 23.) Rene briefly transferred to the

Minneapolis/Northwest Fargo territory. (*Id*.) As an employee of both Tulsa and DENTSPLY, Rene built strong relationships with her customers. (*Id*. ¶ 32.)

When Rene received her offer for employment from Tulsa in June 2006, her offer stated: "Attached is your Employment Agreement, which is an integral part of this offer of employment. To accept this offer of employment, you must also agree to the conditions in the Employment Agreement" (the "Agreement"). (Doc. No. 9, Connolly Aff. ¶ 2, Ex. A.) Rene signed and returned an executed copy of the Agreement, along with an executed offer letter. (*Id*.) Rene re-affirmed her assent to the Agreement in February 2009, when she accepted a promotion to Implant Account Executive. (*Id*. ¶ 2, Ex. B.) The Agreement states in relevant part:

> I [Rene] will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION or, in the event I am a sales representative, I will not work for CONFLICTING ORGANIZATION in geographic areas in which I worked while employed by the Company, for a period of two (2) years after termination of my employment with the Company, except that I may accept employment with a CONFLICTING ORGANIZATION, whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORANIZATION, provided the Company, prior to my accepting such employment shall receive separate written assurances satisfactory to the Company from such CONFLICTING ORGANIZATION and from me, that I will not render services, directly or indirectly, in connection with any CONFLICTING PRODUCT.

(Connolly Aff. ¶ 2, Ex. A at ¶ 6.) In addition, the Agreement provides the following relevant definitions:

> "CONFLICTING ORGANIZATION" means any person (including myself as individual serving as a consultant or independent contractor) or organization which is engaged or about to become engaged in research on or development, production, marketing or selling of a CONFLICTING PRODUCT.

3

. . .

"CONFLICTING PRODUCT" means any product, process, machine, material or service in existence or under development, of any person or organization other than the Company, which resembles or competes with any product manufactured, distributed or under development by the Company incorporating CONFIDENTIAL INFORMATION to which I had access during my term of employment with the Company, or whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION to which I shall have had access during my employment by the Company.

. . .

"CONFIDENTIAL INFORMATION" means information disclosed to me or known or acquired by me as a result of my employment by the Company, not generally known in the trade or industry in which the Company is engaged, about the Company's products, processes, machines, materials and services, including research, planning, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling and the names of existing or future customers, clients, and accounts of the Company as well as the needs and requirements of said customers.

(Connolly Aff. ¶ 2, Ex. A.) In addition, the Agreement provides that, in a case where a former employee is unable to obtain employment commensurate with her training and education because of her obligations under the Agreement, DENTSPLY would make monthly payments to the employee. (Connolly Aff. ¶ 2, Exs. A & B ¶ 7.)

Rene was originally hired with Tulsa as an Endodontic Specialist. (Doc. No. 16, Rene Decl. ¶ 5.) In February 2009, Rene became an Implant Account Executive. (*Id*.) As an Implant Account Executive, Rene sold "Ankylos," a dental implant product. (*Id*.) Rene submits that, in 2011, DENSTPLY acquired a competitor, Astra Tech Dental, and that the integration of the companies became effective on April 2, 2012. (*Id*.) Rene claims the corporate culture changed dramatically for the worse, leading her to resign.

(*Id.* ¶¶ 7, 8.) Rene claims that when she left, she had no intention of returning to the dental implant industry, and that she returned all DENTSPLY property and information. (*Id.* ¶ 9.) Rene submits that she did not take any tangible items from DENTSPLY, did not take or use any customer lists or price lists, did not take the password to the sales website, has no confidential information in her possession, and that she did not copy or transfer any information from DENTSPLY when she left. (*Id.*) Rene explains that she does store names and telephone numbers on her mobile phone, and that her phone contacts include friends, family, former colleagues and employees of DENTSPLY, as well as some doctors who may be customers of DENTSPLY, Nobel Biocare, Bard, or from other jobs Rene has had. (*Id.* ¶ 10.) Rene maintains that contact information for oral surgeons, oral surgery practices, and dentists in her geographic region is available on the Internet. (*Id.*)

On January 10, 2013, Rene was hired by Nobel Biocare as a Territory Representative. (Rene Decl. ¶ 2.) At Nobel Biocare, Rene sells and supports sales accounts for dental implants, abutments, and related services. (*Id.* ¶ 2.)[1] Rene's sales

---

[1] In the eight months between the time she resigned from DENTSPLY Implants and the time she began working for Nobel Biocare, Rene worked for C.R. Bard, Inc. ("C.R. Bard"). (Rene Decl. ¶ 4.) Rene claims that C.R. Bard does not compete with Nobel Biocare or DENTSPLY Implants. (*Id.* ¶ 3.)

territory includes St. Paul, Minnesota, north to Duluth, Minnesota, and parts of Western Wisconsin, including Eau Claire. (*Id.*)[2]

Plaintiffs assert that, in her new sales position with Nobel Biocare, Rene has contacted at least seven of DENTSPLY's clinical customers, including oral surgeons and dentists, with whom she worked while employed by DENTSPLY. (Baldwin Aff. ¶ 31.) Plaintiffs also assert that Nobel Biocare is a direct competitor of DENTSPLY and that Nobel Biocare sells many of the same products as DENTSPLY, including implants, related computer software, abutments, and instruments. (*Id.* ¶ 28.) Rene does not dispute that DENTSPLY and Nobel Biocare are competitors and notes that virtually all of the practice groups of oral surgeons in her geographic area maintain some inventory for DENTSPLY and Nobel Biocare, as well as other competing manufacturers. (Rene Decl. ¶¶ 12-13.) Rene also asserts that most, if not all, of the oral surgeons she called upon while working for DENTSPLY were also Nobel Biocare customers already. (*Id.* ¶ 14.) Rene insists that her approach to making sales does not involve the use of confidential information and that any information about prices prior to 2013 would not be of value to a competitor, as most manufacturers update their prices and product lines on an annual basis. (*Id.* ¶ 16.)

In their Complaint, Plaintiffs assert the following claims: (1) breach of employee agreement; (2) misappropriation or threatened misappropriation of confidential

---

[2]   Rene asserts that she cannot relocate to a new region, as she is subject to a divorce decree that does not allow her to move outside a 30-mile radius of her home. (*Id.* ¶ 22.)

information; and (3) claim for equitable relief. (Doc. No. 1, Compl.) Plaintiffs also move for a temporary restraining order, which the Court considers below.

## DISCUSSION

The Court considers four primary factors in determining whether a temporary restraining order should be granted: (1) the threat of irreparable harm to the moving party; (2) the likelihood of the moving party's success on the merits; (3) the state of balance between the alleged irreparable harm and the harm that granting the injunction would inflict on the other party; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). This analysis was designed to determine whether the Court should intervene to preserve the status quo until it decides the merits of the case. *Id*. None of the factors by itself is determinative; rather, in each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### A. Likelihood of Success

This *Dataphase* factor requires that the movant establish a substantial probability of success on the merits of its claim. *See Dataphase*, 640 F.2d at 114. Plaintiffs have asserted a breach of contract claim against Rene based on the alleged violation of the Agreement's terms, and a cause of action based on the alleged misappropriation of confidential information. With respect to the breach of contract claim, Plaintiffs assert

that the Agreement is a valid contract supported by adequate consideration and that the non-compete within the Agreement is both necessary for the protection of the business or goodwill of DENTSPLY and is not broader than necessary to protect those interests. Plaintiffs further assert that because Rene was working for Nobel Biocare in the same geographic territory in which she worked for DENTSPLY, and because she is using confidential information, Rene has breached the Agreement. With respect to the misappropriation claim, Plaintiffs assert that, despite notice, Rene has contacted at least seven of DENTSPLY's clinical customers since joining Nobel Biocare, and that it appears that Rene has been using DENTSPLY's confidential customer information for the benefit of her new employer.

Rene argues that Plaintiffs have not shown they are likely to succeed on the merits of their breach of contract claim. Rene's primary argument is that the non-compete in the Agreement is not a blanket restrictive agreement, but rather that the terms of the Agreement provide that Rene, as a former employee, is restricted from *only* the use of Plaintiffs' confidential information in the former employee's successive employment. Rene further argues that Plaintiffs cannot establish that Rene has possessed or used Plaintiffs' confidential information.

Under Minnesota law, restrictive covenants are to be strictly construed, but will be enforced to the extent that they protect a legitimate business interest of the employer. *See Prow v. Medtronic, Inc.*, 770 F.2d 117, 120 (8th Cir. 1985); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1094 (D. Minn. 1981). The covenant must be reasonable, and to determine the reasonableness of a non-compete agreement, the Court considers:

(1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction. *Prow*, 770 F.2d at 120.[3]

In this case, the Court agrees with Plaintiffs that the Agreement protects Plaintiffs' legitimate interests and, at least preliminarily, that the non-compete is reasonable in its geographic scope and length of time. *See, e.g.*, *Timm & Assocs., Inc. v. Broad*, Civ. No. 05-2370, 2006 WL 3759753, at *4 (D. Minn. Dec. 21, 2006) (two-year restriction reasonable); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 703 (Minn. Ct. App. 1989) (upholding a geographic restriction that was limited to area necessary to protect former employer). Thus, the Court concludes, preliminarily, that the non-compete provision in the Agreement is reasonable.

This does not end the Court's inquiry, however, as the Court must determine whether Plaintiff is likely to succeed in demonstrating that Rene has breached the terms of the non-compete. By signing the Agreement, Rene agreed not to render services to any "conflicting organization" in the geographic areas in which she worked while employed by Plaintiffs for a period of two years. (Connolly Aff. ¶ 2, Ex. A at ¶ 6.) The Agreement defines a "conflicting organization" as "any . . . organization which is engaged or about to become engaged in research on or development, production,

---

[3] It appears to the Court that the Agreement is supported by adequate consideration; Defendants do not contest this point.

marketing or selling of a CONFLICTING PRODUCT." (*Id.*) "Conflicting product" is defined, in relevant part, as "any product . . . which resembles or competes with any product manufactured, distributed or under development by the Company incorporating CONFIDENTIAL INFORMATION" to which Rene had access to during her employment with Plaintiffs or a product "whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION" to which Rene had access. Finally, "Confidential Information" is defined as:

> information disclosed to me or known or acquired by me as a result of my employment by the Company, *not generally known in the trade or industry in which the Company is engaged*, about the Company's products, processes, machines, materials and services, including research, planning, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling and the names of existing or future customers, clients, and accounts of the Company as well as the needs and requirements of said customers.

(*Id.* (emphasis added).)

The Court agrees, at least at this preliminary stage, with Rene's reading of the Agreement—particularly that any restriction placed on Rene related to working for a competing organization is limited to the sale of a "conflicting product," which in turn is connected to the use of "confidential information." Thus, under the plain terms of the Agreement, Rene would not violate the terms of the non-compete by working for a

10

competitor in the same geographic area unless that work also involved the use of "confidential information."[4]

Plaintiffs assert that Rene is using DENTSPLY's confidential information. Specifically, Plaintiffs assert that "[i]t appears that Ms. Rene has been capitalizing on [DENTSPLY's] confidential customer information—which she has a duty to protect—for the benefit of her new employer." (Doc. No. 7 at 24.) However, after careful review of the evidence submitted and the arguments of the parties, the Court finds that Plaintiffs have not met their burden of establishing that Rene has used any confidential information in her position with Nobel Biocare. In particular, Plaintiffs have not made a sufficient showing that Rene used information not generally known in the trade or industry in making sales with her new employer. Plaintiffs have offered no evidence that Rene took any documents or other electronic information upon leaving DENTSPLY. Moreover, while Plaintiffs submit evidence that Rene has contacted DENTSPLY customers, they have not put forth evidence that Rene used confidential information in making those contacts.[5] Because the Agreement appears to be narrowly crafted to cover

---

[4] This narrow restriction is consistent with other terms of the Agreement, namely the provision that, in a case where a former employee is unable to obtain employment commensurate with her training and education because of her obligations under the Agreement, DENTSPLY would make monthly payments to the employee. (Connolly Aff. ¶ 2, Exs. A & B ¶ 7.)

[5] At the hearing, Plaintiffs submitted two e-mail messages from Rene to Casey Baldwin, the Central Regional Manager at DENTSPLY, to support their claim that Rene had, and used, confidential information while working for Nobel Biocare. The Court has reviewed both messages, as well as the Supplemental Declaration of Shari L. Rene (Doc.

(Footnote Continued on Next Page)

only the use of DENTSPLY's confidential information, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits. Accordingly, the Court finds that this factor weighs against granting a temporary restraining order.[6]

### C. Irreparable Harm

The movant must establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages. *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). Plaintiffs contend that Rene's use of DENTSPLY's confidential information and goodwill will cause damage to its customer and prospective customer relationships, and that the harm will be immediate and irreparable without an injunction. Rene submits that Plaintiffs have failed to make a showing of irreparable harm because they offer no evidence that Rene took or used any of Plaintiffs' confidential information, that Rene has made a single sale to any customer of Plaintiffs, or that sales by Rene to Plaintiffs' customers could not be compensable by money damages.

Here, as discussed above, Plaintiffs have not demonstrated that they are likely to prevail on the merits of their breach of contract or misappropriation claims. Thus, the

---

(Footnote Continued From Previous Page)

No. 20), and finds that the messages are not sufficient to demonstrate that Rene used confidential information.

[6] For reasons similar to those discussed above, the Court concludes that Plaintiffs have not met their burden to establish a likelihood of success on the merits of their misappropriation claim.

Court also finds that Plaintiffs have not demonstrated that they are threatened with irreparable harm. This factor weighs against granting a temporary restraining order.

### D. Balance of Harms and Public Interest

The third *Dataphase* factor to be considered is whether the harm to the movant in the absence of injunctive relief outweighs the potential harm that granting injunctive relief may cause to the non-movant. *See Dataphase*, 640 F.2d at 114. The final *Dataphase* factor to be considered by a court is whether injunctive relief is in the public's interest. *Id*. At this early stage, and in light of the Court's findings above, the Court concludes that these factors weigh against granting a temporary restraining order.

## CONCLUSION

For all of the reasons discussed above, the Court concludes that the balance of equities does not favor Plaintiffs and justice does not require the Court to intervene to preserve the status quo until the merits are determined. While the Court denies Plaintiffs' motion for a temporary restraining order, the Court notes that this was a close call. The Court understands that many, if not most, non-compete provisions are intended to cover a situation where a former employee begins working for a direct competitor in the same geographic area, but the actual language of the non-compete at issue here appears to be more narrowly drawn, so as to prohibit only the use of confidential information while working for a competitor. The Court also notes, however, that this Order is not determinative of future motions, and there is no guarantee that the Court's current view of the parameters of the non-compete will stand in future motions, particularly as the

record and arguments are supplemented and refined. The Court strongly suggests that the parties make an attempt to resolve this case.

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Temporary Restraining Order (Doc. No. [6]) is **DENIED**.


Dated: March 6, 2013                             s/Donovan W. Frank
                                                 DONOVAN W. FRANK
                                                 United States District Judge